65 N.J. Super. 242 (1961)
167 A.2d 642
FRANCIS M. GREENE, PLAINTIFF-APPELLANT,
v.
DIRECTOR OF DIVISION OF MOTOR VEHICLES, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 9, 1961.
Decided January 20, 1961.
*243 Before Judges CONFORD, FREUND and KILKENNY.
Mr. John J. Wygant argued the cause for plaintiff-appellant (Miss Jeanne P. Gallagher, attorney).
Mr. William J. Murray argued the cause for defendant-respondent (Mr. James M. Kenihan, attorney).
The opinion of the court was delivered by CONFORD, S.J.A.D.
We are here confronted with another troublesome mixed question of law and fact involving the notice provision of the Unsatisfied Claim and Judgment Fund Law, N.J.S.A. 39:6-61 et seq., 65 (L. 1952, c. 174). See Giles v. Gassert, 23 N.J. 22 (1956); Russo v. Forrest, 52 N.J. Super. 233 (App. Div. 1958); Giacobbe v. Gassert, 29 N.J. 421 (1958). The specific problem is whether the plaintiff was "physically incapable" of giving the statutory notice, prerequisite to a claim against the Fund, during such period of time as the law, as interpreted by the cases, specifies for that purpose.
Plaintiff, while a pedestrian crossing a Garden State Parkway entrance at Perth Amboy, was struck and injured by a "hit-and-run" car on September 12, 1958, sustaining serious injuries to his left leg. Through a lawyer, plaintiff filed the requisite notice of intention with the Fund on March 4, 1959. On motion, the Law Division dismissed the claim for lateness of notice after hearing testimony relating to that single issue, all other conditions for liability being conceded by the Fund to have been satisfied.
N.J.S.A. 39:6-65 requires that a qualified claimant
"shall, within 90 days after the accident, as a condition precedent to the right thereafter to apply for payment from the fund, give *244 notice to the board, the form and contents of which shall be prescribed by the board, of his intention to make a claim thereon for such damages if otherwise uncollectible; provided, any such qualified person may, in lieu of giving said notice within said time, make proof to the court on the hearing of the application for the payment of a judgment (a) that he was physically incapable of giving said notice within said period and that he gave said notice within 90 days after he became physically capable to do so or in the event he did not become so capable, that a notice was given on his behalf within a reasonable period, * * *." (Emphasis supplied)
Applying the view that "the act is to be liberally construed to advance the remedy, due regard being had for the protection of the fund and the realization of the essential legislative design," the Supreme Court has held that a showing of the requisite physical incapacity to give notice is made out where, "because of the physical injuries and their treatment and preoccupation with his affliction and fear of evil consequences, the victim of the mishap was not mentally and emotionally adjusted to his responsibility of giving notice * * *." Giacobbe v. Gassert, supra (29 N.J., at p. 425); and see Giles v. Gassert, supra (23 N.J., at pp. 28, 29).
Here, the testimony adduced showed that plaintiff had sustained a markedly comminuted fracture of the left tibia and fibula, middle third; fracture of the neck of the left fibula, with numerous other contusions, lacerations, and abrasions of his arms, abdomen and pelvic region and a laceration of the head requiring approximately eleven sutures. He was under medical care for one year following the accident, during which time he was confined to Perth Amboy General Hospital six times.
Plaintiff's first confinement to the hospital was from September 12, 1958 to September 27, 1958. The treatment of the leg injury was described by the attending physician as follows:
"Q. Now, Doctor, will you tell us what type of operation was performed at the hospital on September 12 for the correction of the comminuted fracture? A. In Mr. Greene's case, his was a markedly comminuted fracture, as you can see from the X-ray. And Mr. Greene was not unconscious following the accident, but *245 quite confused. And he states that he tried to walk on the bone ends. An operation was performed to, No. 1, correct the bony defects, that is, to put the bones in apposition. No. 2, to clean the devitalized muscles, for we know that infection occurs if that is not performed. Parts of the bone were missing. There were, oh, probably eight or twelve fragments 
Q. Excuse me, Doctor. What bone was it? A. The tibia, the main bone of the leg.
Q. How long was that? How wide was that fracture of the tibia bone? A. It was a complete fracture right across, and the leg was laid open all across the front. The necessary toilet of the area was performed under anesthesia. And as well as possible, in view of the fact that some of the pieces of bone were missing, approximation was obtained by pulling both the proximal and distal fragments together with a metallic plate and held with four metallic screws.
Q. Where were the screws inserted? A. Through the plate into the bone  two in the upper fragment and two in the lower fragment to hold them in apposition.
Q. And the wound then was closed? A. The wound was closed and a cast applied, including the toes, foot, and above the knee, several inches above the knee. Our problem in these compound fractures is to prevent infection.

* * * * * * * *
Q. Doctor, from your experience, and knowledge, and treatment, and correction of fractures, how would you classify this type of comminuted fracture? A. This is a severe comminuted fracture, with loss of substance, which is the worst kind."
Plaintiff suffered such pain during the hospitalization as to require administration of morphine, demerol and aspirin. Six days after the operation morphine and demoral were eliminated in order to prevent drug addiction, but the pain continued, treated only by aspirin. Whereas after an ordinary fracture pain generally regresses after two or three days, pain here continued until the plaintiff was rehospitalized from December 17, 1958 to December 21, 1958. That step was ordered because of plaintiff's complaints to the doctor of "continuous pain in the leg" in the interim. Plaintiff testified there was "always" a "kind of throbbing" pain. An X-ray taken upon the rehospitalization showed "no healing whatsoever," but rather "some separation of the bones." Another cast was applied at that time with the addition of a metallic bar on the foot to stimulate healing.
*246 After discharge from the hospital on December 21, 1958 plaintiff continued to complain of pain. He was consequently readmitted to the hospital March 30, 1959, staying until April 3, 1959. Examination revealed that the plate had loosened because "the bone structure around the screws had absorbed, so that the screws were lying in soft material and would not hold anything." The second cast was removed and the leg prepared for a bone graft. During a later hospitalization bone was grafted from the shin to the tibia to replace the metal. The conditions necessitating these orthopedic procedures supported, in the opinion of the attending physician, the previous continuous complaints of pain by the plaintiff.
Plaintiff testified that during the period between September 27, 1958 and December 17, 1958 he made repeated phone calls to the doctor's office complaining of the pain. The physician, not then knowing the actual condition of the leg, kept assuring him that the leg was progressing satisfactorily and that he should continue to take only aspirin to relieve it. Between the first hospital discharge and the hospitalization in December 1958 plaintiff could walk only with crutches. He was taken to the doctor's office thereafter by car by his parents.
At the time of the accident plaintiff was a truck driver, married, and supporting a wife and two small children. The trial court sustained on grounds of immateriality an objection to a question to plaintiff on direct examination designed to elicit information whether he received payments from his employer toward his medical expenses. The purpose was to show his "mental attitude." (He did receive $50 a week from his union while disabled.) Plaintiff testified that after the accident he "was thinking about my wife and kids  how I was going to support them, feed them and everything." His wife "had to go to the State and collect welfare from the State."
On cross-examination of plaintiff it was developed that he knew about the Unsatisfied Claim and Judgment Fund in *247 a general way but understood "you had to catch the guy that hit you before you could sue the State." He did not realize he had legal recourse to the Fund in a "hit-and-run" case until he saw a lawyer in March 1959.
Plaintiff testified he was physically able to fill out a form during the September-December 1958 period; he filled out hospitalization forms, welfare forms (a representative came to the hospital), and forms mailed him by the union.
In his oral remarks on decision of the motion, the trial judge read pertinent sections of the Giacobbe decision, supra, but concluded that testimony to meet the criteria of physical disability set forth in that opinion had not been adduced by the plaintiff. It was found determinative that plaintiff knew of the Unsatisfied Claim and Judgment Fund Law and was able to fill out the various other types of forms mentioned. We are constrained to conclude that the court gave the Giacobbe opinion too narrow an application. While the issue here is, technically, factual, the question is not one so much of appraisal of the credibility of witnesses, but rather of the inferences to be drawn from largely undisputed operative facts and of the degree of liberality of construction to be accorded the statute, as authoritatively construed by the Supreme Court.
While the extent of the claimant's injuries in Giacobbe was greater than in the case of plaintiff herein, there is no essential difference in the two cases as to the inferability of the injured parties' emotional and mental distress in consequence of the kind of injuries involved (in both cases comminuted compound leg fractures). The evidence in the present case discloses a continuous, mentally disturbing and distracting absorption of the plaintiff over the ever-present pain in his leg during the period between the two 1958 hospitalizations, if not even later. We know as a fact that the conditions responsible for the pain were not rectified until the resetting and bone-graft of the leg in 1959. And plaintiff was upset over economic problems affecting his family. Equally with the situation which concerned the plaintiff in *248 Giacobbe must it fairly be concluded here that the plaintiff, because of his physical injuries and his continuous pain and worry about his condition, "was not mentally and emotionally adjusted to his responsibility of giving notice" until some time after the December 1958 hospitalization.
The fact that considerations of immediate economic survival brought home to plaintiff the necessity of filling out forms for welfare and union payments and the like does not derogate from the justifiable inference of a relationship between his emotional preoccupation over his mishap and his failure to appreciate and learn about the necessity of filing notice with the Fund. As was said of the selfsame consideration in the Giacobbe case, "His incapacity in all likelihood was a factor contributing to his continued ignorance of the law and the fund created for relief in such cases" (29 N.J., at p. 426). Here the plaintiff knew about the law but not that it applied in his case. In principle, there is no difference in the two situations. Nor does the circumstance that forms were filled out for other pressing purposes become conclusive "of the issue of continuing capacity to realize and satisfy the need of giving the notice * * *," Giles v. Gassert, supra (23 N.J., at p. 29).
Further militating for the application of the Giacobbe result here is the absence of prejudice to the Fund in the lateness of the notice, a matter there, too, held significant, although not per se excusing failure of proper notice (29 N.J., at p. 426). It was stated by plaintiff's counsel below, in response to a question from the court, that a police report of this accident was on file indicating a complete police investigation had been made to learn the identity of the owner or operator of the "hit-run" vehicle, but without success. This was not refuted. As was also stressed in Giacobbe, this plaintiff acted in "utmost good faith"; he did not "willfully default in his obligation"; and the Fund was created to ameliorate just such misfortunes as his (29 N.J., at p. 426). Its social purpose calls for giving him its succor.
*249 It is settled that a full, unbroken 90-day period of physical capacity, or of freedom from physical incapacity, must elapse without the giving of notice before it will be held that the notice-provision of the statute bars a claim. See Giles v. Gassert, supra (23 N.J., at p. 35). We have found above that plaintiff was continuously physically incapacitated, in the sense of the Giacobbe criteria, to give notice, at least until the end of the second hospitalization period, December 21, 1958. Assuming capacity arose at that time, which we doubt, notice was filed less than 90 days thereafter, and was consequently timely.
Reversed.