ELIZABETH WHITE, PLAINTIFF-APPELLANT, v. VIOLENT
CRIMES COMPENSATION BOARD, AN AGENCY OF THE
STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued January 24, 1978—Decided May 25, 1978.

*Ms. JoAnn Ivory Gibson,* Assistant Deputy Public Advocate, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Advocate, attorney).

*Ms. Carla Vivian Bello,* Deputy Attorney General, argued the cause for respondent (*Mr. William F. Hyland,* Attorney

General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

The opinion of the court was delivered by

PASHMAN, J. On September 15, 1973 eighteen-year-old Elizabeth White was the victim of a brutal criminal assault and rape as a result of which she suffered severe bodily injuries, including a broken jaw, "tremendous" facial bruising and other head injuries. Plaintiff was hospitalized until September 26, 1973, and her jaw was wired shut until October 30, 1973. Although some of her medical bills were paid by insurance, she incurred substantial out-of-pocket expenses in obtaining the required restorative medical and dental care. In addition, her injuries caused her to miss some six weeks of her work as a seamstress.

Despite her debilitated condition, plaintiff was able to provide the police with a description of her assailant on the night of the attack and to identify him by photograph and in person at the hospital the next day. With her jaw still wired and her speech difficult, she later testified before the Ocean County Grand Jury. The assailant subsequently entered pleas of guilty to charges of rape and atrocious assault and battery and was sentenced to a ten-to-twelve year term of imprisonment in July 1974.

After her release from the hospital, plaintiff was "hesitant to be around people and didn't go anyplace much." This shyness, understandably occasioned by the physical and emotional trauma of her ordeal, was exacerbated by the removal of the wiring from her jaw. The full dental plates she had been wearing prior to the tragic occurrence were destroyed as a result of the savage beating inflicted upon her by the assailant. Plaintiff lacked sufficient financial resources to obtain replacement plates until March 1974, when she was able to borrow the necessary amount from her brother. Thus, plaintiff was without any teeth for a number of months. Her embarrassment over her physical appearance enhanced her already great reluctance to participate in

normal social activities, causing her to limit her primary social contacts to her family. Her psychological state is poignantly demonstrated by her statement that her main reason for taking a job in a clothing factory was the fact that she "did folding work sitting at a table and didn't have to speak to anyone."

In late November 1973 plaintiff and her mother went to the Ocean County Courthouse to inquire as to how she might receive financial relief for the pecuniary losses she suffered as a result of being the victim of a crime. Plaintiff had previously been advised by an unspecified employee of the County Prosecutor that the Prosecutor's Office "would be my lawyer and take care of everything." She had incorrectly understood this statement to mean that the County Prosecutor would represent her in proceedings to obtain the appropriate civil relief as well as in the prosecution of her attacker. At the courthouse she was referred by a receptionist to the nearby legal services office, which proceeded to refer her to the Ocean County Welfare Board. A caseworker there informed plaintiff that she could not be helped by the Welfare Board and referred her to the welfare director of her municipality. In all these conversations, plaintiff mentioned that her financial distress was a direct result of her being the victim of a criminal attack.

Plaintiff continued her diligent pursuit of assistance by subsequently seeking advice as to the solution to her predicament from the municipal welfare director, a local attorney, a business manager of a hospital and the local police, all to no avail. She was still operating under the assumption that her crime-related losses would be "taken care of when the criminal case was over." In September 1974, plaintiff contacted the Prosecutor's Office to inquire about the status of the prosecution against her assailant. She then learned for the first time that he had already been convicted and sentenced. In response to her query as to what could be done about her bills, she was told that her only avenue of relief would be to retain her own attorney to

bring a civil action against her assailant. This was the first time plaintiff learned that the Prosecutor's Office would not be able to remedy her financial difficulties. Since she was unable to afford private counsel, plaintiff was quite distraught at this turn of events.

Several weeks later plaintiff learned of the existence of a local community action agency where she might be able to obtain assistance in resolving her financial problems. A counselor there had heard of a crime victim's aid agency in another state and attempted to ascertain whether such an agency existed in New Jersey. After numerous unsuccessful inquiries, a call to the office of the legislative representatives for the area yielded, after some investigation, the name and address of the respondent Violent Crimes Compensation Board (the Board) and the identity of one of its members, who lived in Ocean County.

Upon learning of the details of plaintiff's situation, the Board member, R. Richard Kushinsky, Esq., advised the counselor to write to the Board at once to request the forms for submitting a claim, which the counselor did on November 1, 1974. When the forms were received, plaintiff and the counselor gathered the necessary supporting material and submitted the claim application on November 6. The claim was filed with the Board on November 8, 1974.

The Board processed plaintiff's application and verified all of the factual details of her claim, concluding that she was the victim of a violent crime of the requisite magnitude who did sustain pecuniary losses as a result of the injuries she suffered and was thus properly eligible for compensation. Nevertheless, on April 1, 1975 plaintiff was advised by the Board's claims investigator that he was recommending the denial of her claim for compensation because it had not been filed within the time specified by the statute controlling the Board's operations. Plaintiff requested a hearing before the Board itself, which was held on May 15, 1975. The Board formally denied her claim on July 24, 1975. In its order of denial, the Board observed that had plaintiff's claim been

filed in timely fashion she would have qualified for compensation. Although recognizing that a statutory limitation period may be tolled in situations of infancy or incapacity, the Board found that neither of these "exceptions" was applicable in plaintiff's case and accordingly held that the untimely filing mandated denial of her claim.

Plaintiff then took her case to the Department of the Public Advocate's Citizen Complaint Division, which requested the Board to "retroactively extend" the statutory deadline for the filing of plaintiff's claim. The Board declined to reconsider its decision. Pursuant to $R.$ 2:2–3(a)(2), the Public Advocate appealed the Board's denial of compensation to the Appellate Division, which, in an unpublished opinion, affirmed the decision of the Board. The court held that the "time limit in question is a condition precedent to a victim's eligibility for compensation." Discerning no judicial power to "relax that condition" even in cases where hardship results, the court ruled that plaintiff's claim was barred by the statutory limitation period. We granted plaintiff's petition for certification. 75 $N. J.$ 15 (1977).

## I

Our initial task is to assess the nature of the statutory time limitation on the filing of claims with the Board. In response to increasing public concern for the plight of innocent victims of violent crime, the Legislature enacted the Criminal Injuries ·Compensation Act of 1971 (the Act), $L.$ 1971, c. 317, $N. J. S. A.$ 52:4B–1 et seq. This statutory scheme created an administrative mechanism whereby victims of certain enumerated crimes could obtain limited reimbursement for their financial losses occasioned by the commission of the crime upon application to the Violent Crimes Compensation Board. See $N. J. S. A.$ 52:4B–3, 10, 11, 12, 18; $N. J. A. C.$ 13:75–1.1 et seq.; see generally Note, 27 Rutgers Law Review 727 (1974). The portion of the Act pertinent for present purposes provides:

No order for the payment of compensation shall be made under section 10 of this act [N. J. S. A. 52:4B–10] unless the application has been made within 1 year after the date of the personal injury or death, and the personal injury or death was the result of an offense listed in section 11 of this act [N. J. S. A. 52:4B–11] which had been reported to the police within 3 months after its occurrence.

\* \* \*

[N. J. S. A. 52:4B–18]

*See also* N. J. A. C. 13:75–1.5(a). We agree with the Appellate Division that compliance with the statutory requirement that an application for compensation be filed in timely fashion is a "condition precedent" to eligibility for compensation under the Act.

Statutes of limitation are not all of the same species. Courts have long recognized distinctions among the several types most frequently found. A "true" or "pure" statute of limitations is generally said to operate only to preclude the enforcement of a right by barring a remedy after the expiration of the limitation period without destroying the underlying right itself. See *Zoffer v. Crane,* 120 N. J. Super. 538, 540 (App. Div. 1972). Statutes of this variety are commonly known as "remedial" or "procedural" statutes of limitation. See *Union City Housing Authority v. Commonwealth Trust Co.,* 25 N. J. 330, 335 (1957). A second type, often referred to as "substantive" or "jurisdictional" statutes of limitation, is said to extinguish the underlying right as well as to bar the remedy. In *Marshall v. Geo. M. Brewster & Son., Inc.,* 37 N. J. 176 (1962), we considered the implications of such a statute in the choice-of-law context:

When the legislature of a state creates or recognizes a right, it may, if it so chooses, subject it to a limitation in such manner that the right is to terminate upon expiration of the limitation. In such cases, the limitation will be viewed not as simply procedural but as part of the state's substantive law. \* \* \* On the other hand, the legislature may intend that the limitation operate not as a condition of the right but as the ordinary statute of limitations which is customarily viewed as procedural. Most courts, though by no means all, have construed the limitations in their wrongful death acts as

substantively conditioning the rights granted and such construction has been given effect elsewhere. * * *

[37 *N. J.* at 181]

Special limitation periods are generally deemed substantive when they are created concurrently with a novel cause of action. Accordingly, the statutory tolling provisions, now embodied in *N. J. S. A.* 2A:14-21, applicable to the general "remedial" statutes of limitation have been construed to be inapplicable to such special substantive limitation statutes. See *Grabert v. Central R. R. Co.,* 91 *N. J. L.* 604, 605 (E & A 1918). A third "hybrid" type of limitation statute defines substantive rights itself and may preclude a right from even coming into existence as well as disallowing its enforcement. *See O'Connor v. Altus, 67 N. J.* 106, 121-22 (1975); *Rosenberg v. Town of North Bergen, 61 N. J.* 190, 199 (1972).

We are satisfied that the limitation period set forth in *N. J. S. A.* 52:4B-18 is properly characterized as a member of the substantive class of limitation statutes. The "right"[1] to compensation for losses resulting from the commission of a violent crime was unknown at common law. Moreover, the fact that the one year filing limitation is "built in" to the statutory scheme suggests that it goes to the essence of the right granted and was intended as a condition thereon. However, the determination that the statutory restriction on the

---

[1]We use the term "right" advisedly. We recognize that the Board is vested with a large measure of discretion in determining whether compensation shall be awarded to persons who meet the statutory criteria, as the statutory language is carefully couched in permissive terms. *See N. J. S. A.* 52:4B-10 to 12.

In addition, *N. J. S. A.* 52:4B-9 directs the Board to consider budgetary constraints in determining the amount of compensation payable under the Act. We regretfully note that the Board itself has been a victim of under-funding since its inception, which has hampered its fulfillment of the salutary legislative goal. *See* Zarate, *Crime Victims Sit and Wait,* Newark Star Ledger, March 16, 1978 at p. , col. ; *see also The Sad Plight of Crime's Victims,* The Paterson News, March 22, 1978 at p. 8, col. 1-2.

timely filing of applications with the Board is a substantive condition on the victim's eligibility for compensation does not end our inquiry.

With respect to a substantive limitation period, traditional and respectable authority has construed a party's noncompliance with its requirements as an absolute bar to his claim. It was often held that no equitable circumstances could justify any judicial expansion of the time limitation for taking action, despite the harshness of the result in a particular case. We are persuaded that the underlying talismanic adherence to this concept found in much of the decisional law on this subject disserves the goals of justice. As Justice Traynor of the California Supreme Court has observed:

Clearly, whether a particular statute of limitation is viewed as substantive or procedural, the consequences of a failure to commence legal proceedings within the specified time are the same insofar as the claimant is concerned * * *.

> [*In re Caravas' Estate*, 40 Cal. 2d 33, 250 *P.* 2d 593, 597 (1952)]

In one of the early cases recognizing "a chink in the supposedly impregnable armor of the substantive time limitation," the United States Court of Appeals for the Fourth Circuit declared:

* * * the distinction between a remedial statute of limitations and a substantive statute of limitations is by no means so rock-ribbed or so hard and fast as many writers and judges would have us believe. Each type of statute, after all, still falls into the category of a statute of limitations. And this is nonetheless true even though we call a remedial statute a pure statute of limitations and then designate the substantive type as a condition of the very right of recovery. *There is no inherent magic in these words.*

> [*Scarborough v. Atlantic Coast Line R. Co.*, 178 *F.* 2d 253, 259 (4 Cir. 1949) (emphasis added)]

The court went on to reject the "legalistic distinction between the closely related types of statutes of limitations" and held that the substantive limitation period on suits under the

Federal Employers' Liability Act, 45 *U. S. C.* § 51 *et seq.,* was subject to tolling on equitable grounds. See also, *Glus v. Brooklyn Eastern District Terminal,* 359 *U. S.* 231, 79 *S. Ct.* 760, 3 *L. Ed.* 2d 770 (1959).

The vanguard approach taken by the Fourth Circuit in *Scarborough, supra,* was subsequently approved by the United States Supreme Court in *Burnett v. N. Y. Central R. Co.,* 380 *U. S.* 424, 85 *S. Ct.* 1050, 13 *L. Ed.* 2d 941 (1965), where the Court held that the filing of an FELA action in state court tolled the FELA limitation period so that a subsequently filed action in federal court (after dismissal of the state court action) was not rendered untimely by the expiration of the statutory period. Justice Goldberg outlined the proper approach for determining whether equitable exceptions to a statute of limitations are to be allowed:

> The basic question to be answered in determining whether, under a given set of facts, a statute of limitations is to be tolled, is one "of legislative intent whether the right shall be enforceable. . . after the prescribed time." *Midstate Horticultural Co. v. Pennsylvania R. Co.,* 320 *U. S.* 356, 360, 64 *S. Ct.* 128, 88 *L. Ed.* 96, 101. Classification of such a provision as "substantive" rather than "procedural" does not determine whether or under what circumstances the limitation period may be extended. As this Court has expressly held, the FELA limitation period is not totally inflexible, but, under appropriate circumstances, it may be extended beyond three years. *Glus v. Brooklyn Eastern Terminal,* 359 *U. S.* 231, 79 *S. Ct.* 760, 3 *L. Ed.* 2d 770, See *Osbourne v. United States,* 164 *F.* 2d 767 (CA 2d Cir.) ; *Scarborough v. Atlantic Coast Line R. Co.,* 178 *F.* 2d 253 (CA 4th Cir.) ; *Frabutt v. New York, C. & St. L. R. Co.,* 84 *F. Supp.* 460 (D.C. W.D. Pa.). These authorities indicate that the basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances.
>
> In order to determine congressional intent, we must examine the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the rights given by the Act. * * *
>
> [380 *U. S.* at 426–7, 85 *S. Ct.* at 1053]

The Court added a significant observation in a footnote:

* \* \* the fact that the right and limitation are written into the same statute does not indicate a legislative intent as to whether or when the statute of limitations should be tolled. Thus the "substantive" — "procedural" distinction would seem to be of little help in deciding questions of extending the limitation period.

> [380 *U. S.* at 427 n. 2, 85 *S. Ct.* at 1054 n. 2 (citations omitted)]

Applying the principles announced to the case before it, the Court held that the commencement of the state suit fulfilled the policies of repose and certainty sought to be advanced by the statutory limitation provision and therefore operated to toll the running of the time period. 380 *U. S.* at 432–435, 85 *S. Ct.* 1050.

In the recent case of *American Pipe & Const. Co. v. Utah,* 414 *U. S.* 538, 94 *S. Ct.* 756, 38 *L. Ed.* 2d 73 (1974), the Supreme Court faced the issue of whether the commencement of a class action suit under the antitrust laws suspended the applicable statute of limitations for all purported members of the class who would have been parties had class action status not been denied. The pertinent section of the Clayton Act provided that suits thereunder were "forever barred" unless commenced within four years after accrual of the cause of action. 15 *U. S. C.* § 16. In addition to setting a precise limitation period, the statute further provided for tolling thereof in certain specified circumstances. The antitrust defendants argued that the statutory inclusion of not only a limitation period but also a specific tolling rule made "the 'substantive' statute immune from extension by 'procedural' rules." The Court noted that the precedents in support of that proposition relied on by the defendants

* \* \* did not purport to define or restrict federal judicial power to delineate circumstances where the applicable statute of limitations would be tolled.

> [414 *U. S.* at 557, 94 *S. Ct.* at 768]

The Court reaffirmed the approach taken in *Burnett, supra*:

The proper test is not whether a time limitation is "substantive" or "procedural," but whether tolling the limitation in a given context is consonant with the legislative scheme.

[414 *U. S.* at 557–58, 94 *S. Ct.* at 768]

The Court went further and stated that "a judicial tolling of the statute of limitations does not abridge or modify a substantive right afforded by the antitrust acts * * *" to antitrust defendants. 414 *U. S.* at 558 n. 29, 94 *S. Ct.* at 768 n. 29. It concluded by holding that

* * * the mere fact that a federal statute providing for substantive liability also sets a time limitation upon the institution of suit does not restrict the power of the federal courts to hold that the statute of limitations is tolled under certain circumstances not inconsistent with the legislative purpose.

[414 *U. S.* at 559, 94 *S. Ct.* at 769]

 We believe that this approach is sound and far superior to the rather mechanistic treatment this issue has traditionally been accorded. Our inherent judicial power under *N. J. Const.* (1947), Art. 6, § 1, par. 1, is at least as broad in scope as that of the Supreme Court of the United States. We therefore adopt the view that in the case of a statutorily created right, a "substantive" limitation period may appropriately be tolled in a particular set of circumstances if the legislative purpose underlying the statutory scheme will thereby be effectuated.

## II

Our analysis must now turn to the objectives the Legislature sought to achieve in enacting the Criminal Injuries Compensation Act and in setting the one year limitation on applications to the Board. The manifest purpose of the Act is the humane and remedial one of attempting to compensate innocent victims of violent crimes by providing a measure of relief from the economic consequences of their misfortune. In this respect the Act is analogous to the Unsatisfied Claim and Judgment Law, *L.* 1952, *c.* 174 as amended, *N. J. S. A.*

39:6–61 *et seq.;* which performs a similar function for victims of automobile accidents involving uninsured or "hit-and-run" vehicles who are otherwise remediless. Both are legislative attempts to ameliorate the injustice to the victims resulting from a basic shortcoming of the tort liability system: the futility or impossibility of prosecuting a civil damage claim against a financially irresponsible or even unknown tort feasor. *See Douglas v. Harris,* 35 *N. J.* 270, 279 (1961).

Similarly apt is the analogy between the purposes of the *N. J. S. A.* 52:4B–18's limitation on applications for compensation to the Board and the requirement of *N. J. S. A.* 39:6–65 that a person intending to seek payment from the Unsatisfied Claim and Judgment Fund shall, as a "condition precedent to the right thereafter to apply for payment," give notice of his intention to file a claim to the Unsatisfied Claim and Judgment Fund Board. Our cases construing the latter provision have indicated that the notice requirement is "designed to afford a timely inquiry and thus to safeguard the fund against fraud and imposition." *Giacobbe v. Gassert,* 29 *N. J.* 421, 425 (1959); *Giles v. Gassert,* 23 *N. J.* 22, 34 (1956). Notwithstanding the remedial purposes of the Fund, we have recognized that public policy demands that it be strictly administered in order

* * * to assure that only those persons legitimately entitled to participate in its benefits are paid therefrom.

> [*Douglas v. Harris, supra,*
> 35 *N. J.* at 279]

As we have noted in the context of the New Jersey Tort Claims Act, *L.* 1972, *c.* 45, *N. J. S. A:* 59:1–1 *et seq.,* a key purpose of a statutory provision requiring that notice of a claim be presented expeditiously is to ensure "access to current information about the incident giving rise to the claim."[2] *S. E. W. Friel Co. v. N. J. Turnpike Authority,* 73

[2]The Tort Claims Act generally requires that a notice of claim against a public entity normally be presented within 90 days after

*N. J.* 107, 118 (1977) (citation omitted). The required furnishing of such information prevents the danger of prejudice resulting from an inability to verify a claim based upon stale information and thus serves as an effective screen against potential spurious claims. An identical fraud-prevention purpose is descernible in *N. J. S. A.* 52:4B–18. In order to ensure that the Board's limited resources benefitted only those persons who met the detailed criteria for eligibility under the Act, the Legislature apparently determined that the relatively short time limit on applications for compensation would be the most reasonable means of guaranteeing the "verifiability" of the factual bases of the claims presented to the Board.

Given the overall humanitarian policy of the Act and the plain purpose of its limitation provision that only *bona fide* victims of violent crimes receive the statutory benefits, we must next consider whether the legislative purposes and intent would be fulfilled in the rather unique circumstances of plaintiff's case by a judicial tolling of the statutory limitation period.

The Unsatisfied Claim and Judgment Fund Law specifically provides for a tolling of its notice of claim rule in the event the would-be claimant is "physically incapable" of giving the required notice. *N. J. S. A.* 39:6–65. The requisite incapacity has been broadly defined, consistent with the liberal construction mandated for that remedial enactment. In *Giacobbe v. Gassert, supra,* this Court held that under the totality of the circumstances there presented, the claimant's incapacity for purposes of the statute continued beyond the date of his discharge from hospitalization for his accidental injuries. The claimant had suffered severe fractures of both legs after being struck by a "hit-and-run" driver in early June, 1955; he was released from the hospital

accrual of the cause of action but in no case later than one year after accrual. *See N. J. S. A.* 59:8–8, 9; *S. E. W. Friel Co. v. N. J. Turnpike Authority, supra,* 73 *N. J.* at 118–19.

in late July and confined to a wheelchair with his legs in a cast until February of 1956. During this time he endured much pain as a result of his injuries and was completely dependent on the landlady of his boarding house for his care. The required notice to the Unsatisfied Claim and Judgment Fund Board was not furnished until late December, 1955, shortly after the landlady learned of the newly-created Fund. In holding that the claimant remained "physically incapable" within the meaning of *N. J. S. A.* 39:6–65 at least until that time, Justice Heher outlined the factors which impelled that conclusion:

> * * * it suffices if, because of the physical injuries and their treatment and preoccupation with his affliction and fear of evil consequences, the victim of the mishap was not mentally and emotionally adjusted to his responsibility of giving notice, * * * . * * * It is not dispositive of this issue that the victim was unaware of the statute until his landlady became informed after inquiry. His incapacity in all likelihood was a factor contributing to his continued ignorance of the law and the fund created for relief in such cases; it was then a comparatively new device not within common knowledge and experience. Plaintiff acted in the utmost good faith; he did not willfully default in his obligation, and the fund has not been prejudiced; its administrators have not been disadvantaged in the execution of the statutory policy. There is no contention *contra.* * * *
> [29 *N. J.* at 425–26]

*See also Giles v. Gassert, supra,* 23 *N. J.* at 29–30. *Giacobe's* definition of the requisite physical incapacity to give notice was applied to the case of another "hit-and-run" victim with less severe leg fractures in *Greene v. Director of Motor Vehicles,* 65 *N. J. Super.* 242 (App. Div. 1961), certif. den. 35 *N. J.* 60 (1961). The claimant's injuries there caused continuous pain and serious complications necessitated periodic rehospitalizations. The statutory notice was not given until nearly six months after the injury. The Appellate Division saw "no essential difference in the two cases as to the inferability of the injured parties' emotional and mental distress in consequence of the kind of injuries involved * * *." 65 *N. J. Super.* at 247. It noted the

"continuous, mentally disturbing and distracting absorption" of the claimant with his injuries and accordingly held that he was "continuously physically incapacitated" under the *Giacobbe* criteria notwithstanding the fact that he was able to perform other tasks necessary to his obtaining financial relief for his accident-related expenses. *See* 65 *N. J. Super.* at 247–49.

Judicial treatment of the notice of claim requirements of the Tort Claims Act has also shown a sensitivity to the problems occasioned by the interploy of a would-be claimant's physical incapacity and his unawareness of the obligation to give timely notice. Under *N. J. S. A.* 59:8–9, a claimant may be permitted to file a notice of claim after the expiration of the 90 day period specified in *N. J. S. A.* 59:8–8 in appropriate circumstances upon a showing of "sufficient reasons" for the failure to comply with the ordinarily applicable notice rule. In *S. E. W. Friel Co. v. N. J. Turnpike Authority, supra,* 73 *N. J.* at 119–120, we held that it was a mistaken exercise of discretion to conclude that "sufficient reasons" did not exist to excuse noncompliance where a claimant was, among other things, incapacitated for the entire notice period and also was unaware of the notice requirements of the Tort Claims Act. See also *Kleinke v. Ocean City,* 147 *N. J. Super.* 575 (App. Div. 1977); *Wade v. N. J. Turnpike Authority,* 132 *N. J. Super.* 92 (Law Div. 1975).

Admittedly, both the Unsatisfied Claim and Judgment Fund Law and the Tort Claims Act expressly envision the existence of circumstances which might cause a claimant, as a result of injuries sustained in the incident giving rise to the claim, to be unable to comply with their stringent notice requirements. No similar relief provision exists in *N. J. S. A.* 52:4B–18. Yet even one of the earliest cases holding that a built-in substantive limitation provision was not subject to tolling because of a plaintiff's legal disability (in that case infancy) qualified its rule with a proviso suggesting the result would be different if a plaintiff was

not "legally capable of instituting a suit." *Grabert v. Central R. R. Co., supra,* 91 *N. J. L.* at 605. The absence of an express exception from the filing requirements of *N. J. S. A.* 52:4B-18 for cases of victim incapacitation resulting from the commission of the crime does not foreclose the judicial implication of a toll on that basis if that action is otherwise appropriate under the reasoning we have previously set forth.

We perceive no policy underlying the Criminal Injuries Compensation Act which would preclude allowing a toll because of a victim's crime-induced incapacity. Indeed, the structure and purpose of the Act point toward an opposite conclusion. Unlike claims under the Tort Claims Act, applications for compensation from the Board do not implicate the well-established principle that conditions attached to a limited waiver of sovereign immunity are to be strictly construed.[3] *See Soriano v. United States,* 352 *U. S.* 270, 276, 77 *S. Ct.* 269, 1 *L. Ed.* 2d 306 (1957); *Schillinger v. United States,* 155 *U. S.* 163, 166, 15 *S. Ct.* 85, 39 *L. Ed.* 108 (1894). Conspicuously absent from the Act is any provision comparable to that in the Tort Claims Act stating a clear legislative intent that governmental entities "shall only be liable" as provided in that statute.[4]

---

[3] Contrary to the suggestion made in the dissenting opinion, the State as sovereign is not "liable" for the payment of claims for victim compensation benefits in the sense that term is normally used. As we have observed, see *ante* at 375-376 n. 1, there is no "right" to victim compensation benefits. Moreover, under the *sui generis* scheme of the Criminal Injuries Compensation Act, the Board is "liable" for the payment of victim compensation benefits only to the extent of its funding by the Legislature; there is no "excess" liability on the part of the public treasury for valid claims which cannot be paid because of insufficient funding. Hence, the principles normally applicable in considering sovereign liabiilty for pecuniary claims are largely inapposite in this context. The situation here is in marked contrast to that involving claims against sovereign bodies under the Tort Claims Act, where the governmental entity is liable and public funds directly at stake without regard to appropriations limitations.

[4] We note that two recent cases have relied on these factors in holding that the failure to file a notice of claim within the one

*N. J. S. A.* 59:1–2. Nor do claims for victim compensation involve an adverse third party, as do claims for Worker's Compensation benefits under *N. J. S. A.* 34:15–1 *et seq.*, whose vested rights or legitimate interests in repose might militate against the propriety of any relaxation of the statutory time restriction. See generally *Panzino v. Continental Can Co.,* 71 *N. J.* 298 (1976); *Schwarz v. Federal Shipbuilding and Dry Dock Co.,* 16 *N. J.* 243 (1954); *DeAsio v. Bayonne,* 62 *N. J. Super.* 232 (App. Div. 1960), certif. den. 33 *N. J.* 386 (1960); *Riccioni v. American Cyanamid Co.,* 26 *N. J. Super.* 1 (App. Div. 1953), certif. den. 13 *N. J.* 289 (1953). Nor is there apparent any legislative intent to "cut off" all claims under the Act after a specified time from the commission of the criminal act causing injury to the victim. *Compare O'Connor v. Altus, supra,* 67 *N. J.* at 123. Were these considerations present, our conclusion as to the permissibility of a judicial tolling of the statutory limitation period might be different, notwithstanding the beneficent purposes of the Act.

 Nevertheless, allowing the statute to be tolled because of incapacity resulting from the crime for which victim compensation benefits are sought might be inappropriate in a given case if to do so would undermine the salutary purposes of the limitation provision itself by forcing the Board to base its determination on information of questionable reliability. However, no such problem exists in the instant case since, as we have seen, see *ante* at 372–373, the Board was able to verify the factual bases of plaintiff's claim in every detail. In view of the total verification of the authenticity of her claim, allowing the statutory limitation period to be tolled would not frustrate the legislative goal of protecting the limited resources of the Board from

---

year from accrual of the claim authorized by *N. J. S. A.* 59:8–9 constitutes an absolute bar to recovery. *See Bell v. County of Camden,* 147 *N. J. Super.* 139 (App. Div. 1977); *Pinckney v. City of Jersey City,* 140 *N. J. Super.* 96 (Law Div. 1976). As we have observed, neither of these factors is present in the instant case.

fraudulent claims. The primary purpose of the Act is to provide compensation to persons who have suffered bodily injury from the commission of a serious crime. It would be anomalous indeed if the incapacity resulting from the infliction of those injuries could operate to deprive an otherwise eligible victim of the opportunity to benefit from the legislative enactment designed to mitigate the often devastating economic consequences of such injuries. Accordingly, we conclude that the limitation period of *N. J. S. A.* 52:4B–18 may be tolled for the period of the victim-applicant's crime-induced incapacity in circumstances where the late-filing of the application for compensation does not prejudice the ability of the Board to verify the victim's eligibility.[5]

The authorities relied on by the Board to the effect that *N. J. S. A.* 52:4B–18 constitutes a restriction on the authority of an administrative agency to entertain claims which neither the Board nor a court can waive do not compel a contrary result. See *Scrudato v. Mascot S. & L. Assn. v. Salimone,* 50 *N. J. Super.* 264, 269–70 (App. Div. 1958);

[5]We perceive no realistic basis for our dissenting colleagues' ominous extrapolations as to the asserted claim-generating and re-source-depleting effect of our holding. The number of potential claimants whose cases would even arguably fall within the scope of today's ruling would likely be insubstantial, and of these only a few will be meritorious under the principles we have set forth. The possible administrative cost required to weed-out all but those legitimate claimants is not a valid reason for withholding justice.

Although we need not reach the question of whether crime-induced incapacity alone would warrant tolling of the Act's limitation period, it is not difficult to envision a scenario where the denial of a toll would seem rather absurd. For instance, a person wiith serious injuries is found unconscious by a roadside and remains in that state for more than one year. Although his injuries were believed to result from an auto accident, upon regaining consciousness he reveals that he had been the victim of a criminal assault. A court would find it almost impossible to stay its hand in such a case. *Cf. Sobin v. M. Frisch & Sons,* 108 *N. J. Super.* 99 (App. Div. 1969) (unconsciousness constitutes insanity for purposes of the tolling provisions of *N. J. S. A.* 2A:14–21).

see also *Borough of Park Ridge v. Salimone,* 21 *N. J.* 28, 47 (1956). We perceive no fundamental inconsistency between the holdings of those cases and the approach we have utilized herein. Analysis of the particular statutory schemes there involved under the principles we today adopt commends the results reached. The fact that substantive time restrictions are imposed on the authority of an administrative agency to entertain a claim is not dispositive. For purposes of determining whether a substantive limitation provision may be tolled, there is no significant difference between such a restriction on administrative action and a comparable restriction on the enforceability of a claim in a court of law. Both in effect are restrictions on what is often imprecisely termed the "jurisdiction" of the forum to provide the particular relief authorized by the Legislature. Whether the substantive limitation period applies to administrative or judicial action, the focus of the judicial inquiry must remain on the question of legislative intent.

### III

■ In light of our determination that the tolling of the statutory limitation provision for the period of plaintiff's crime-induced incapacity is appropriate under the particular circumstances of this case, the only remaining question is whether application of that toll renders timely the plaintiff's application for compensation, which was mailed on November 6, 1974 and filed with the Board two days later. Resolution of this issue necessitates an assessment of the duration of plaintiff's incapacity as a result of the injuries she suffered at the hands of her assailant on September 15, 1973. As the factual recital at the outset of this opinion discloses, plaintiff was hospitalized until September 26, 1973 and her broken jaw remained wired shut until October 30, 1973. That her incapacity continued until at least that date cannot be seriously disputed.

Yet, it cannot be realistically contended that the residual physical and psychological effects of her traumatic experi-

ence were miraculously dissipated by the mere removal of the wiring from her jaw. Indeed that event deprived her of her sole means of refuge from her painful embarrassment over having no dentures and consequently caused her to shrink from contacts with anyone outside her family. Moreover, it has been observed that a frequent component of the "rape trauma syndrome" rather consistently encountered in rape victims is a so-called "global fear of everyone" which is often marked by withdrawal from social relationships in reaction to that most dehumanizing of all crimes. See A. Burgess and L. Holmstrom, *Rape: Victims of Crisis* 37–50 (1974); see also A. Burgess and L. Holmstrom, "Rape Trauma Syndrome," *The American Journal of Psychiatry,* September 1974. We do not doubt that the totality of these factors effectively incapacitated plaintiff from normal social functioning for an extensive period of time. Since we are fully satsified that her crime-induced incapacity had not ceased by November 8, 1973, we need not determine exactly when plaintiff could be considered restored to some semblance of her normal self. *Cf. Greene v. Director of Motor Vehicles, supra,* 65 *N. J. Super.* at 249. We accordingly hold that the *N. J. S. A.* 52:4B–18 limitation period was tolled from the date of the crime until at least that date. As a result, the Board's receipt of plaintiff's application on November 8, 1974 is sufficient to establish her compliance with the Act's timely filing requirement, as she was entitled to the full one year period provided by the statute. *Cf. Fox v. Passaic General Hospital,* 71 *N. J.* 122 (1976).

For the foregoing reasons, we hold that plaintiff's application for victim compensation pursuant to the Criminal Injuries Compensation Act of 1971 is not barred by the limitation provision of *N. J. S. A.* 52:4B–18. Accordingly, the judgment of the Appellate Division is reversed and the matter is remanded to the Violent Crimes Compensation Board for further proceedings consistent with this opinion.

CONFORD, P. J. A. D. (temporarily assigned), dissenting. The Court's action here is little short of judicial assumption of the exclusive legislative function of determining when and under what circumstances public money shall be paid out of the State Treasury. It is therefore completely unwarranted — a fact not at all tempered by the sympathy all of us feel for any victim of violent crime such as this unfortunate young woman. In creating the administrative machinery for public compensation of victims of violent crime, the Legislature has clearly and unambiguously directed:

*No order* for the payment of compensation *shall be made* under section 10 of this act *unless* the application has been made within 1 year after the date of the personal injury or death, and the personal injury or death was the result of an offense listed in section 11 of this act which had been reported to the police within 3 months after its occurrence. * * * (emphasis added)

*N. J. S. A.* 52:4B–18

The Court concedes, as perforce it must, that the "statutory restriction on the timely filing of applications with the Board is a substantive condition on the victim's eligibility for compensation * * *." Maj. opinion, pp. 375–376. The condition not having been fulfilled, and payment of public funds being involved, this concession should have been dispositive of the case, as the Appellate Division correctly held. In accord: *Johnson v. Nissman,* 39 *A. D.* 2d 578, 331 *N. Y. S.* 2d 796 (App. Div. 1972), where, after the passage of the statutory time for filing claims against a similar board, the court declared the petitioner's claim barred, "and no other provision of law or consideration of justice can operate to toll its application." 331 *N. Y. S.* 2d at 797. Motivations of fiscal restraint, administrative convenience and minimization of fraudulent claims could entirely reasonably have induced the unconditional time limitations for claims set forth in the statute.

But the Court undertakes to read into the statute a tolling of the one-year limitation on filing of claims for the period of a victim's "crime-induced incapacity." Maj. opinion, p. 384.

Such a provision might conceivably have been a salutary stipulation to insert into the legislation, but the law-making body for its own good reasons did not choose that course. That the Legislature was alert to the availability of such an amelioration of the time constraint is indicated by express provisions of that or comparable nature in the Unsatisfied Claim and Judgment Fund Law, *N. J. S. A.* 39:6–65, and the Tort Claims Act, *N. J. S. A.* 59:8–9; and see *S. E. W. Friel Co. v. N. J. Turnpike,* 73 *N. J.* 107 (1977). The closeness in time of the legislative adoption of the latter act and the one here involved (1972 and 1971, respectively) and the fact that both involve authorization of claims against public agencies highlight the cogency of the observation that had the lawmakers intended relaxation or tolling of the time filing requirement of the crime victim compensation act in cases of incapacity of the victim thcy would surely have so expressly specified.

My conclusion is additionally fortified by the consideration that the lawmakers must be presumed to have realized that a person injured by a criminal will likely be physically incapacitated for a time, and despite that consideration they elected not to allow tolling of the claim time period for physical incapacity of the victim.

Legislative history is additionally supportive of these views. A predecessor bill, Senate 284 (1966), would have allowed 90 days for filing, "except where unusual circumstances preclude the applicant from so doing." Another would have allowed two years for filing after the crime or the victim's death. Assembly 22 (1966). As we know, these more liberal approaches were rejected for a rigid, unconditional claim period of one year. There has from the beginning been distinct evidence of legislative conservatism in appropriating funds for disbursement by the Board.[1] There

---

[1]The Board's appropriation for fiscal year 1977–1978 is $1,235,255. Of this, $1,078,000 is earmarked for claims already filed. *N. J. Appropriation Handbook* 59 (1977–1978).

is thus no basis whatever for inferring a legislative intent to disburse funds for claims not filed strictly within the statutory period, but ample grounds to assume the contrary, concordant with the express statutory mandate.

The Court's action here is distinctly repugnant to the spirit if not the letter of the constitutional principle of immunity of the State to pecuniary claims not expressly authorized by the Legislature. *N. J. Const.* 1947, Art. 8, § 2, par. 2. See *O'Neill v. State Hwy. Dept.,* 50 *N. J.* 307, 315–316 & 316, n. 1 (1967) ; *Taylor v. N. J. Highway Authority,* 22 *N. J.* 454, 466 (1956) ; *Gallena v. Scott,* 11 *N. J.* 231 (1953) ; *cf. Willis et al. v. Dept. of Cons. & Ec. Dev.,* 55 *N. J.* 534 (1970).

Further, the action of the Court portends a signal for the coming forward of any number of the myriad victims of crime who did not file within a year, and thus have properly been advised they were barred, but who may now flood the Board with assertions that their failure timely to file was the result of crime-induced incapacity. The administrative difficulties with which the Board will consequently be faced seem formidable and to project the possibility that the limited funds of the Board will not be most effectively deployed for the relief of the class intended to be aided.

This case is classic evidence of the aphorism that hard cases make bad law.

I dissent. I would affirm the judgment of the Appellate Division.

Justice CLIFFORD joins in this dissenting opinion.

Justice SCHREIBER dissents.

*For reversal and remandment*—Chief Justice HUGHES and Justices SULLIVAN, PASHMAN and HANDLER—4.

*For affirmance*—Justices CLIFFORD and SCHREIBER and Judge CONFORD—3.