927 A.2d 96

IN THE MATTER OF KENNETH A. ROSEN,
AN ATTORNEY AT LAW.

July 16, 2007.

### ORDER

927 A.2d 97

R.A.C., PLAINTIFF–RESPONDENT, v. P.J.S., JR., DEFENDANT–
APPELLANT, AND B.E.C., DEFENDANT.

Argued November 28, 2006—Decided July 17, 2007.

*Melvyn H. Bergstein,* argued the cause for appellant (*Walder, Hayden & Brogan* and *Andrew W. Rubin,* attorneys; *Mr. Bergstein* and *Mr. Rubin,* on the briefs).

*Anthony J. Marchetta,* argued the cause for respondent (*Pitney Hardin,* attorneys; *Mr. Marchetta* and *Brian E. Moffitt,* on the brief).

Justice ALBIN delivered the opinion of the Court.

Under the New Jersey Parentage Act of 1983 (Parentage Act), *N.J.S.A.* 9:17–38 to –59, a person determined to be the biological father of a child can be compelled to pay child support. The Parentage Act's statute of repose, *N.J.S.A.* 9:17–45b, requires that

a support claim be filed before the child turns twenty-three years old. A number of years after the expiration of the period of repose, plaintiff in this case learned that he was not the biological father of the child he had raised as his son. Thereafter, plaintiff filed a child-support-reimbursement claim, and other related claims, against the biological father. In this appeal, we must determine whether *N.J.S.A.* 9:17–45b can be equitably tolled to allow the filing of a child-support-reimbursement complaint against the biological father, eight years after the repose period had elapsed.

## I.

### A.

Plaintiff R.A.C. (Roy)[1] and B.E.C. (Bonnie) were married in 1957, and during the next four years had two children.[2] In the mid–1960s, they became social friends with defendant P.J.S., Jr. (Patrick) and his wife. Between 1968 and 1969, while Roy traveled on business, Bonnie and Patrick engaged in an extra-marital affair. In early 1969, Bonnie became pregnant and aware of the strong possibility that Patrick might be the father of her expected child. Although Bonnie shared her suspicions with Patrick, she never breathed a word to her husband, who remained ignorant about the affair. Bonnie had no intention of upending her life and family over her indiscretion. When D.C. (Darren) was born in

---

[1] To comply with the confidentiality requirements of *N.J.S.A.* 9:17–42, initials were used by the lower courts to identify the names of the parties and other individuals involved in this lawsuit. In this opinion, for ease of reading, we have used fictitious names to refer to the parties and individuals involved in this suit.

[2] The facts presented here were developed in a summary judgment proceeding. Because defendant moved for summary judgment, we must view the facts in the light most favorable to the non-moving party, plaintiff, and give him "the benefit of all favorable inferences in support of [his] claim" for child support reimbursement. *Parks v. Rogers,* 176 *N.J.* 491, 495, 825 *A.*2d 1128 (2003); *see also R.* 4:46–2(c); *Brill v. Guardian Life Ins. Co. of Am.,* 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

October 1969, Roy had no reason to doubt that he was the child's biological father. Indeed, Roy, along with his wife, chose Patrick to be Darren's godfather.

Bonnie and Patrick never discussed whether they should attempt to verify Darren's parentage. In 1970, Patrick moved to Florida, where his wife and two children had relocated earlier. At the time, both of his children were afflicted with muscular dystrophy, from which they would unfortunately die years later. Even after the move, Bonnie and Patrick continued to have romantic trysts on the few occasions she would travel to Florida and he to New Jersey.

As the years passed, Roy and Darren enjoyed a typical loving and warm father-son relationship. For reasons apparently unrelated to the affair, Roy and Bonnie's marriage foundered, and, in 1980, they divorced. During the divorce proceedings, Bonnie did not inform Roy or the court about her doubts concerning Darren's parentage. After the divorce, as part of a property settlement agreement, Roy provided child and educational support for all three children, including Darren. Roy generously fulfilled his parental duties, not only paying all of Darren's college expenses pursuant to a modification of the divorce decree,[3] but also providing financial support to Darren beyond the court-ordered obligations. For example, Roy gave financial assistance to Darren to attend an art school between 1992 and 1994 and a post-graduate program at the University of Montana between 1996 and 1998. During all those years, they maintained a strong father-son relationship.

As Darren matured into adolescence, Bonnie noticed that he did not resemble his siblings, which caused her to believe more strongly that Patrick was Darren's biological father. In 1986, Bonnie met with Patrick and told him about her supposition and,

---

[3] At the support-modification hearing, Bonnie again failed to inform the court or Roy concerning her doubts about Darren's parentage.

in the same conversation, asked for "some money" to help her out. He declined her request for financial assistance.

In July 1996, Darren, then twenty-six years old, was planning to get married, and his mother feared that he might be a carrier of the muscular dystrophy gene. At that time, she felt it necessary to tell her son of his probable biological background so that he could make informed decisions about having a family. During a visit with her son in Washington State, she told him that she thought that Patrick might in fact be his father. Expectedly, he reacted with shock to the announcement.

After that revelation, Darren spoke by telephone with Patrick and told him what he had learned from his mother. Patrick later said that he was not just surprised but "dumbfounded by [the] news." Thereafter, the two met in Seattle, along with Bonnie. According to Darren, at the meeting, Patrick admitted that he was his biological father and afterwards agreed to assist him with a loan. In March 1997, Darren borrowed additional monies from Patrick. Finally, in July 1997, Darren visited with Patrick in Florida. That meeting did not go well because, as recalled by Patrick, Darren badgered him for more money. After this encounter, Patrick concluded that Darren was only interested in extracting money from him and therefore he "cut off all relations with [Darren]."

Bonnie had told Darren that she would break the news to Roy about Darren's suspected paternity. She waited three years to follow through. In August 1999, following a dinner out with Roy and one of their other children, she invited Roy back to her home. During dessert, with the simple introduction, "I have something to tell you," Bonnie disclosed that Patrick was Darren's father. Roy was left "speechless;" the disclosure "hit [him] like a bolt." Bonnie explained that she had been unsure for a long time about Darren's paternity, but became convinced as Darren matured into adulthood.

Thereafter, Roy grew increasingly angry that Bonnie and Patrick had hidden the truth from him for more than thirty years.

Nevertheless, Roy and Darren's relationship with each other remained unaffected, and Darren reaffirmed his love and respect for Roy, the person he considered to be his true father. Darren felt that the ordeal brought them even closer together.

### B.

In September 2000, Roy filed a verified complaint in the Family Part against Patrick seeking a judgment under the Parentage Act that Patrick was Darren's biological father and reimbursement for child support provided to Darren. He also alleged fraudulent concealment and intentional infliction of emotional distress, seeking an award of compensatory and punitive damages, and attorneys' fees and costs. Bonnie was named in the complaint as a necessary party.

After voluntary DNA testing of Roy, Bonnie, and Darren conclusively determined that Roy was not Darren's biological father, Roy moved to compel Patrick to undergo DNA testing. The Family Part rejected Patrick's motion to dismiss the action as time-barred and ordered him to submit to the testing, which revealed that he was indeed Darren's father. Based on those results, the court declared Patrick to be Darren's biological father.

Roy and Patrick filed cross-motions for summary judgment. For purposes of his motion *only*, Patrick stipulated that he knew from the beginning that he was Darren's biological father.[4] He stated, however, that his knowledge was irrelevant because the ultimate decision concerning disclosure rested with Bonnie, who was entitled "not to jeopardize or harm her marriage and family by raising any question of paternity with her husband." Patrick also stipulated that the court-ordered child support provided to Darren through his twenty-second year equaled $109,696.82 and that continued financial assistance thereafter amounted to $23,819.00.

---

[4] Patrick steadfastly denied, in fact, that he knew that he was Darren's father.

## C.

The motion court dismissed Roy's fraud and emotional distress claims as well as his claim for treble damages, attorneys' fees, and prejudgment interest. The court concluded that the Parentage Act exclusively "establishe[d] the types of permitted damages" in parentage cases and limited those damages to such things as child support and medical expenses. It found that Roy was entitled to reimbursement for the court-ordered child support he paid until Darren's emancipation, which totaled $109,696.82, but not to reimbursement for any voluntary post-emancipation financial assistance.

The court determined that the Parentage Act's statute of limitations[5] did not apply to the reimbursement claim. The court reasoned that the Parentage Act was not intended to shield Patrick from legitimate claims, but rather to protect the child and his family. It also noted that the "Statute of Limitations should not frustrate [the son's] right to know his own potential genetic make-up," particularly in light of the "serious medical condition" he may have inherited from his biological father.

The court also denied Patrick's motion to file a cross-claim against Bonnie for contribution and Roy's motion to amend his complaint to add an unjust enrichment claim. Both sides appealed.

## D.

The Appellate Division affirmed all of the motion court's determinations, except its conclusion that the Parentage Act did not authorize an award of attorneys' fees to a prevailing party. *R.A.C. v. P.J.S., Jr.*, 380 *N.J.Super.* 94, 119, 880 *A.2d* 1179 (App.Div.2005). Thus, in upholding Roy's right to reimbursement for all court-ordered pre-emancipation child support expenses, the

---

[5] We note that both the motion court and the Appellate Division refer to *N.J.S.A.* 9:17–45b as a statute of limitations. As we will discuss, that statute is properly characterized as a statute of repose.

panel remanded to the motion court the decision whether to grant attorneys' fees to Roy as the prevailing party pursuant to *N.J.S.A.* 9:17–54.[6] *Id.* at 114, 880 *A.*2d 1179.

We will discuss only that part of the Appellate Division opinion that is relevant to the issue before us. The panel addressed the novel question of "whether [Roy's] claim under the Parentage Act is time-barred." *Id.* at 102, 880 *A.*2d 1179. The panel found the discovery rule inapplicable because *N.J.S.A.* 9:17–45b is not an accrual statute of limitations. *Id.* at 108, 880 *A.*2d 1179. In contrast, the Parentage Act's limitations period is triggered by "two fixed and specified events, i.e., the birth of the child and the child's attainment of the age of majority." *Ibid.* The panel classified *N.J.S.A.* 9:17–45b as a "substantive" statute of limitations and on that basis maintained that "equitable doctrines" would have to be applied "with reference to the legislative purpose underlying" the Parentage Act. *Id.* at 107, 880 *A.*2d 1179. The panel determined that the "application of the doctrine of equitable tolling in this case [did] not undermine the purposes of the Parentage Act." *Id.* at 109, 880 *A.*2d 1179. Specifically, allowing Roy's claims to proceed would not "disrupt fragile familial relationships," thus "leav[ing] a young child bereft of required paternal guidance," but rather lead to "a reconciliation of obligations." *Ibid.*

The panel noted that although statutes of limitations generally protect a party from having to defend against stale claims, when that party induces or tricks a putative plaintiff into letting the deadline pass, equitable tolling may apply. *Id.* at 108, 880 *A.*2d 1179. Here, the panel found that Patrick and Bonnie engaged in a pattern of deception, concealing from Roy his son's true parentage. *Id.* at 109, 880 *A.*2d 1179. Accordingly, the panel affirmed both the motion court's decision not to dismiss the complaint as

---

[6] *N.J.S.A.* 9:17–54 provides: "The court may order reasonable fees of counsel, experts, and the child's guardian ad litem, and other costs of the action and pretrial proceedings, including blood or genetic tests, to be paid by the parties in proportions and at times determined by the court."

time-barred and its award of reimbursement of the court-ordered pre-emancipation expenses. *Id.* at 109–10, 880 *A.*2d 1179.

Roy and Patrick both petitioned for certification. We granted Patrick's petition and denied Roy's. 187 *N.J.* 81, 899 *A.*2d 303 (2006). The sole issue before us is whether the Appellate Division properly applied equitable tolling to the limitations period contained in *N.J.S.A.* 9:17–45b, thus permitting Roy's claim to proceed under the Parentage Act.

## II.

By the time of Darren's emancipation, Roy had provided child support in the amount of $109,696.82. Not until Darren approached his thirtieth birthday did Roy learn that Patrick was in fact the biological father of the child that Roy had raised as his son. A year later—by then almost eight years after the expiration of the twenty-three-year applicable statute of repose—Roy filed a claim for reimbursement of child support expenses under the Parentage Act. Roy contends that the failure of his former wife and Patrick to disclose their adulterous relationship and their knowledge of the circumstances of Darren's birth constituted a fraudulent concealment that equitably tolls the limitations period. He therefore asks this Court to affirm the decision of the Appellate Division, which ordered Patrick to reimburse him for his financial support of Darren up through Darren's emancipation. On the other hand, Patrick argues that *N.J.S.A.* 9:17–45b was intended to interdict the very type of claim raised here, a claim rising from the distant past that upsets the long settled expectations of a party.

The essential question is whether, under the present facts, the Parentage Act's statute of repose, *N.J.S.A.* 9:17–45b, is subject to the doctrine of equitable tolling. To answer that question, we begin with a brief overview of the relevant sections of the Parentage Act.

## A.

The New Jersey Parentage Act, *N.J.S.A.* 9:17–38 to –59, is modeled after the Uniform Parentage Act of 1973. Assembly Judiciary, Law, Public Safety and Defense Committee, *Statement to Senate Bill No. 888,* at 1 (Oct. 7, 1982) (*L.* 1983, *c.* 17) (hereinafter *Assembly Committee Statement*). The Parentage Act was intended to "establish the principle that regardless of the marital status of the parents, all children and parents have equal rights with respect to each other and to provide a procedure to establish parentage in disputed cases." *Ibid*; *see also Wingate v. Estate of Ryan,* 149 *N.J.* 227, 233, 693 *A.*2d 457 (1997); *Unif. Parentage Act* § 1 Comment (1973), *available at* http://www.law.upenn.edu/bll/archives/ulc/fnact99/upa7390.htm. Under New Jersey law, "parents have a duty to support their children from" birth until emancipation, which presumptively occurs when the child reaches the age of majority. *Wingate, supra,* 149 *N.J.* at 239, 693 *A.*2d 457. A "major concern" of the Parentage Act is ensuring that children receive their statutory right to financial support. *Id.* at 238, 693 *A.*2d 457; *see also Fazilat v. Feldstein,* 180 *N.J.* 74, 82, 848 *A.*2d 761 (2004) ("The New Jersey Parentage Act helps families deal with the problems posed by fathers who seek to avoid paying child support."); Press Release, Office of Governor Thomas H. Kean (Jan. 23, 1983) ("The legislation is designed to facilitate attempts by the Division of Public Welfare to obtain support from fathers who refuse to admit paternity.").

To that end, the Parentage Act provides all children with a judicially enforceable right to such support, regardless of their parents' marital status. *Assembly Committee Statement,* at 1. Under the Act, any person who has furnished financial support to a child may institute a proceeding seeking reimbursement for reasonable educational, medical, or other support related expenses from the father. *N.J.S.A.* 9:17–55a. The Act also provides the means for legally identifying the father by granting the "alleged" father or "any person with an interest recognized as justiciable by the court" standing to bring an action "for the purpose of deter-

mining the existence or nonexistence of the parent and child relationship." [7] *N.J.S.A.* 9:17–45a.

The time period for filing such an action, however, is not indefinite. The Parentage Act provides that "[n]o action shall be brought under [the Act] more than 5 years after the child attains the age of majority." *N.J.S.A.* 9:17–45b. A person reaches that "majority" age when he turns eighteen years old. *N.J.S.A.* 9:17B–1(a). Accordingly, the Parentage Act establishes a "twenty-three-year statute of repose," commencing from the date of the child's birth. *Wingate, supra,* 149 *N.J.* at 233, 693 *A.2d* 457. Had Darren filed a support claim at age thirty-one, his action seemingly would have been barred by the repose statute for two reasons: the limitations period "balances [his] right to support with the State's interest in requiring prompt filing of parentage actions" and "a parent is relieved of the duty to provide support upon the child's emancipation." *Id.* at 239, 693 *A.2d* 457.

For purposes of the repose statute, the Parentage Act does not distinguish between a child's direct claim for support or an "interested" person's right to reimbursement for providing child support. *See N.J.S.A.* 9:17–45a. Roy filed the present action after Darren had turned thirty-one years old—almost eight years beyond the expiration date of the repose statute. Ordinarily, the plain language of a statute is the best indicator of legislative intent. *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.2d* 1039 (2005). Here, the statutory words, standing alone, do not allow for the tolling of the statute under any circumstance, equitable or otherwise. At this point, typically, the analysis would end. However, we have a long established jurisprudence interpreting statutes of limitations and repose, and therefore *N.J.S.A.* 9:17–45b

---

[7] Pursuant to *N.J.S.A.* 9:17–43a(1), "a man is presumed to be the biological father of a child if ... [h]e and the child's biological mother are or have been married to each other and the child is born during the marriage." This presumption can be rebutted by "clear and convincing evidence." *N.J.S.A.* 9:17–43b.

cannot be viewed in isolation from our preexisting case law. It is a complex jurisprudence encrusted with many fine distinctions that have developed over time. To that jurisprudence, we now must turn.

### B.

A statute of repose governs the time period for filing an action under the Parentage Act.[8] *Wingate, supra,* 149 *N.J.* at 233, 693 *A.*2d 457 (stating that *N.J.S.A.* 9:17–45b is statute of repose). The basic feature of a statute of repose is the fixed beginning and end to the time period a party has to file a complaint. *Lieberman v. Cambridge Partners, L.L.C.,* 432 *F.*3d 482, 490 (3d Cir.2005) (citing *P. Stolz Family P'ship L.P. v. Daum,* 355 *F.*3d 92, 102 (2d Cir.2004)). After the expiration of the statutory period, "a cause of action literally ceases to exist no matter when the harm arose." *Cyktor v. Aspen Manor Condo. Ass'n,* 359 *N.J.Super.* 459, 473, 820 *A.*2d 129 (App.Div.2003) (citing *Rosenberg v. Town of N. Bergen,* 61 *N.J.* 190, 199, 293 *A.*2d 662 (1972)). The repose statute, in effect, bars " 'what might otherwise be a cause of action from ever arising.' " *Ebert v. S. Jersey Gas Co.,* 157 *N.J.* 135, 138, 723 *A.*2d 599 (1999) (quoting *Rosenberg, supra,* 61 *N.J.* at 199, 293 *A.*2d 662). Importantly, a repose period bears no relationship to when the injury occurs or the cause of action accrues, *Umsted v. Umsted,* 446 *F.*3d 17, 22 n. 4 (1st Cir.2006), and confers immunity on a defendant after running its course, *Van Slyke v. Worthington,* 265 *N.J.Super.* 603, 608, 628 *A.*2d 386 (Law Div.1993).

The primary consideration underlying a statute of repose is "fairness to a defendant," the belief that there comes a

---

8 *Compare N.J.S.A.* 9:17–45b ("No action shall be brought under [the Act] more than 5 years after the child attains the age of majority"), *with N.J.S.A.* 2A:14–1.1 (architects and builders) (*"No action … shall be brought … more than 10 years after* the performance or furnishing of such services and construction.") (emphasis added). We have characterized *N.J.S.A.* 2A:14–1.1 as a statute of repose. *See Greczyn v. Colgate–Palmolive,* 183 *N.J.* 5, 9, 869 *A.*2d 866 (2005).

time when the defendant " 'ought to be secure in his reasonable expectation that the slate has been wiped clean of ancient obligations. . . .' " *Rosenberg, supra,* 61 *N.J.* at 201, 293 *A.*2d 662 (quoting *Developments in the Law: Statutes of Limitations,* 63 *Harv. L.Rev.* 1177, 1185 (1950)). Because of the deference owed to a legislative enactment, courts generally do not expand the limitations period defined by a statute of repose unless the Legislature carved out exceptions that permit for tolling. *Lieberman, supra,* 432 *F.*3d at 490. A number of jurisdictions do not permit a statute of repose to be tolled for any purpose. *See, e.g., Munoz v. Ashcroft,* 339 *F.*3d 950, 957 (9th Cir.2003) (stating that "[s]tatutes of repose are not subject to equitable tolling" because Congress enacted cut-off dates for such statutes); *Amoco Prod. Co. v. Newton Sheep Co.,* 85 *F.*3d 1464, 1472 (10th Cir.1996) (holding "equitable tolling is not appropriate against a statute of repose"); *Ferguson v. Roberts,* 11 *F.*3d 696, 706 n. 14 (7th Cir.1993) (noting equitable tolling principles are inapplicable to statute of repose); *First United Methodist Church v. United States Gypsum Co.,* 882 *F.*2d 862, 866 (4th Cir.1989) (commenting that "a statute of repose is typically an absolute time limit beyond which liability no longer exists and is not tolled for any reason because to do so would upset the economic balance struck by the legislative body"), *cert. denied,* 493 *U.S.* 1070, 110 *S.Ct.* 1113, 107 *L.Ed.*2d 1020 (1990).

Unlike a statute of repose, a statute of limitations "generally accrues from the date of the negligent act or omission." *Martinez v. Cooper Hosp.-Univ. Med. Ctr.,* 163 *N.J.* 45, 51, 747 *A.*2d 266 (2000); *see Rosenberg, supra,* 61 *N.J.* at 199, 293 *A.*2d 662 (noting generally that statutes of limitations calculate time within which injured party must commence action "from the moment the cause of action accrues"). There are two different kinds of statutes of limitations, procedural and substantive. Procedural statutes of limitations apply to causes of action that were recognized under the common law, such as tort and contract causes of action. *LaFage v. Jani,* 166 *N.J.* 412, 422, 766 *A.*2d 1066

(2001).[9] When a procedural statute of limitations runs its course, only the remedy is barred, not the common law right. *Ibid.* The limitations period in a procedural statute is not construed strictly, but rather flexibly, guided by equitable principles to achieve a just end. *Ibid.* Equitable principles such as the discovery rule and estoppel have traditionally applied to procedural statutes of limitations. *Negron v. Llarena,* 156 *N.J.* 296, 300, 716 *A.*2d 1158 (1998).

The discovery rule, for example, is intended to mitigate the harsh and unjust result that would follow by barring the door of the courthouse to a blameless, injured person who is unaware that he has suffered an injury until after the statute of limitations has run. *Lopez v. Swyer,* 62 *N.J.* 267, 273–74, 300 *A.*2d 563 (1973). Under the discovery rule, which typically applies to certain accrual statutes governing tort actions, the limitations period does not commence until the injured party actually discovers or should have discovered through reasonable diligence the fact essential to the cause of action. *See Grunwald v. Bronkesh,* 131 *N.J.* 483, 494, 621 *A.*2d 459 (1993). Significantly, New Jersey courts have not extended the discovery rule to a repose statute that commences and ends on specifically timed events. *See Brookins v. Murray,* 131 *N.J.* 141, 151, 619 *A.*2d 583 (1993) ("The discovery rule as an equitable doctrine has not been applied to all so-called 'statutes of limitations.' The tendency in New Jersey has been to reject the discovery rule for statutes of limitations that run from a fixed, specified event.").

In contrast to procedural statutes, substantive statutes of limitations apply to legislatively created causes of action that did not exist at common law. *Negron, supra,* 156 *N.J.* at 300, 716 *A.*2d 1158. Those limitations periods bar both the remedy and the right itself. *Ibid.* Historically, when determining whether to

---

[9] Notably, at common law, there were no fixed limitations periods for the filing of a cause of action. Marian Joyce, Note, *Tolling of Substantive Statutes of Limitations—White v. Violent Crimes Compensation Board,* 32 *Rutgers L.Rev.* 95, 97 (1979).

apply equitable principles to a limitations period, courts have differentiated between substantive and procedural statutes of limitations. *White v. Violent Crimes Comp. Bd.,* 76 *N.J.* 368, 374–75, 388 *A.*2d 206 (1978). Indeed, it was "often held that no equitable circumstances could justify any judicial expansion of the time limitation for taking action, despite the harshness of the result in a particular case." *Id.* at 376, 388 *A.*2d 206. For the most part, the jurisprudential concerns that gave rise to the distinctions between procedural and substantive statutes of limitations no longer have the same relevance. *LaFage, supra,* 166 *N.J.* at 421–22, 766 *A.*2d 1066; *White, supra,* 76 *N.J.* at 374, 388 *A.*2d 206 (noting that substantive/procedural distinction was recognized in "choice-of-law context"); *see* Marian Joyce, Note, *Tolling of Substantive Statutes of Limitations—White v. Violent Crimes Compensation Board,* 32 *Rutgers L.Rev.* 95, 97 (1979) (acknowledging that "[t]he distinction between substantive and procedural statutes of limitation appears to have originated in the field of conflicts of laws").

In *White, supra,* we were "persuaded" that the distinctions between procedural and substantive statutes of limitations found in much of the decisional law "disserve[d] the goals of justice." 76 *N.J.* at 376, 388 *A.*2d 206. In that case, we adopted the approach taken by the United States Supreme Court, which stated that " '[t]he proper test is not whether a time limitation is 'substantive' or 'procedural', but whether tolling the limitation in a given context is consonant with the legislative scheme.' " *Id.* at 376–79, 388 *A.*2d 206 (quoting *Am. Pipe & Const. Co. v. Utah,* 414 *U.S.* 538, 557–58, 94 *S.Ct.* 756, 768, 38 *L.Ed.*2d 713, 729 (1974)). We concluded in *White* that "in the case of a statutorily created right, a 'substantive' limitation period may appropriately be tolled in a particular set of circumstances if the legislative purpose underlying the statutory scheme will thereby be effectuated." *Id.* at 379, 388 *A.*2d 206. Thus, today, the application of equitable principles to a substantive statute of limitations " 'depends on statutory interpretation focusing on legislative intent and pur-

pose.'" *LaFage, supra,* 166 *N.J.* at 422, 766 *A.*2d 1066 (quoting *Negron, supra,* 156 *N.J.* at 304, 716 *A.*2d 1158).

 Although statutes of repose and statutes of limitations are distinct concepts, we have at times equated substantive statutes of limitations to statutes of repose. *See Greczyn v. Colgate–Palmolive,* 183 *N.J.* 5, 18, 869 *A.*2d 866 (2005). Indeed, *N.J.S.A.* 9:17–45b has characteristics of a substantive statute because there was no obligation for a father to provide support to his illegitimate child under the common law. *State v. Clark,* 58 *N.J.* 72, 83, 275 *A.*2d 137 (1971).[10] Moreover, we have equated statutes of repose with substantive statutes of limitations and suggested that equitable principles would apply if consonant with the legislative intent and purpose. *Greczyn, supra,* 183 *N.J.* at 18, 869 *A.*2d 866.

 With regard to procedural and substantive statutes of limitations, our case law reveals that the doctrine of equitable tolling of limitations periods has been applied only in narrowly-defined circumstances. *See, e.g., Price v. N.J. Mfrs. Ins. Co.,* 182 *N.J.* 519, 525–27, 867 *A.*2d 1181 (2005) (holding that equitable tolling applied where insurance company statements and conduct lulled plaintiff and his attorney into believing that plaintiff's uninsured motorist claim was properly filed); *Freeman v. State,* 347 *N.J.Super.* 11, 31, 788 *A.*2d 867 (App.Div.) (finding that court may utilize tolling doctrine where one party has engaged in overt trickery that induced plaintiff to forgo timely filing of complaint), *certif. denied,* 172 *N.J.* 178, 796 *A.*2d 895 (2002). The question here is whether equitable tolling can ever apply to a repose statute. Because the Court's approach in *White* concerning substantive statutes of limitations appears logically applicable to repose statutes, we believe that it can. However, in light of the purpose of a repose statute, which is to set a fixed end to the limitations period regardless of when the cause of action accrues,

---

[10] It bears mentioning that the Appellate Division in this case never refers to *N.J.S.A.* 9:17–45b as a statute of repose and analyzes that provision solely as a substantive statute of limitations.

we expect that equitable tolling will arise only in extraordinary circumstances consistent with legislative intent.

## III.

### A.

█ With those principles in mind, we now must determine whether the doctrine of equitable tolling applies to *N.J.S.A.* 9:17–45b and allows for the filing of a child support reimbursement action eight years beyond the Parentage Act's limitations period. Roy claims that he was the victim of deception by his former wife and Patrick, who withheld from him the truth about Darren's parentage, and urges this Court to apply the tolling doctrine to the Parentage Act's statute of repose.

█ As mentioned earlier, the plain language of *N.J.S.A.* 9:17–45b makes clear that an action under the Parentage Act cannot be brought after the child turns twenty-three. Therefore, exceptions not found in the repose statute itself *ordinarily* will not be imported through an equitable doctrine. Thus, we must look to the purpose that animates the Parentage Act to determine whether the Legislature intended equitable tolling of the repose statute in the circumstances of this case and whether such tolling would effectuate the statutory scheme. *See DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039 ("The Legislature's intent is the paramount goal when interpreting a statute.").

█ We first note that the scant legislative history sheds little light on the issue before us. *See Assembly Committee Statement,* at 1–7. The legislative purpose, however, can be gleaned from the statutory language itself. The Parentage Act provides a twenty-three-year window for a child, mother, putative father, or other interested person to establish paternity. *N.J.S.A.* 9:17–45a–b. Within that period, for instance, a child has a right to substantiate through legal means the identity of his father, and through his mother or other surrogate, obtain financial support until he or she attains the age of majority. *N.J.S.A.* 9:17–45a, –55a. Within that

timeframe, a person supporting a child whose father can be identified is entitled to bring an action for child support reimbursement. *Ibid.* The twenty-three-year timeframe for filing a paternity action coincides with the recognized period when a child is in need of financial support and a parent legally bears a financial obligation to provide that support. *See Wingate, supra,* 149 *N.J.* at 239, 693 *A.*2d 457. In most cases, a parent will no longer be bound to support a child who reaches the age of majority. *Newburgh v. Arrigo,* 88 *N.J.* 529, 543, 443 *A.*2d 1031 (1982). Therefore, the "major concern" of the Parentage Act—the financial support of children—is no longer an issue after children have reached the age of twenty-three and presumably are capable of supporting themselves.

By setting a fixed time period, the Legislature evidently understood that there would be cases, perhaps many cases, in which paternity would not be established within the twenty-three-year timeframe and that a biological father who bore the responsibility of raising and supporting a child would be relieved of his obligation. The Legislature did not create a scheme providing for an indefinite liability period, but instead created one that allowed persons to reasonably expect that the slate would one day be "wiped clean." The Legislature evidently knew what has been known since time immemorial—that children would be born of adulterous relationships and that the true identity of the father might not be known for more than twenty-three years. The repose statute does not contain any carve out for such situations.

We believe that the facts here do not fall outside of the heartland of cases in which the Legislature intended the twenty-three-year bar to apply. This is a sad, heartbreaking case of a man who learned that an essential truth had been withheld from him for thirty years. In no way do we mean to deprecate Roy's suffering or sense of betrayal. He built a life based on a false foundation. But for more than thirty years, Roy has presented Darren to the world as his son and he has enjoyed a son's love and companionship that has deepened even with this litigation.

This is not a case in which a defendant engaged in overt trickery or active deception, such as making misrepresentations that caused Roy to sleep on his rights.[11] At most, Patrick knew that he was the father of Darren but did nothing to alert Roy to that fact.[12] For Patrick, a course other than silence would have had grave consequences for two families.

It is true that had Roy known about Darren's parentage within the repose statute's twenty-three-year time span he could have filed a complaint under the Parentage Act and sought child support reimbursement, and presumably Patrick would have been compelled to provide reimbursement and continuing financial support to Darren. *See N.J.S.A.* 9:17–45a, –55a. But once the repose period has ended, a parentage action cannot be brought unless the Legislature intended tolling to apply to the particular circumstances of a case.

In light of the language and purpose of the Parentage Act, we cannot conclude that the Legislature intended Patrick to lose the protection of the repose statute unless he, without Bonnie's consent, brought to Roy's attention the details of his adulterous relationship and the questionable paternity of Darren. We cannot conclude that the Legislature intended Patrick to lose the protec-

---

[11] The Appellate Division, in limited circumstances, has indicated that equitable tolling might apply even if a defendant does not take affirmative steps to prevent a plaintiff from filing a cause of action. *See, e.g., Bernoskie v. Zarinsky,* 344 *N.J.Super.* 160, 166, 781 *A.2d* 52 (App.Div.2001) (concluding that equitable tolling might apply in wrongful death action if murderer avoids detection and apprehension beyond statute of limitations); *Dunn v. Borough of Mountainside,* 301 *N.J.Super.* 262, 276–81, 693 *A.2d* 1248 (App.Div.1997) (applying equitable tolling to limitations period in tort action involving sexual assault by police officer who hindered plaintiff's filing personal injury claims by his failure to report his own criminal conduct, as required by his office), *certif. denied,* 153 *N.J.* 402, 709 *A.2d* 795 (1998). Unlike the defendants in *Bernoskie* and *Dunn,* Patrick did not engage in criminal conduct or have a legal obligation to report his infidelity.

[12] Although for summary judgment purposes Patrick conceded knowledge of paternity, in truth Patrick could only have had a great degree of awareness of his probable paternity.

tion of the repose statute unless he came forward with information that surely could have broken up both his and Bonnie's marriages. The disclosure of such information even after Roy and Bonnie's divorce could have wrought havoc on strongly bonded family relationships. In short, nothing in the Parentage Act, particularly its repose statute, suggests that the Legislature intended to deny a person the shield of the repose statute because he did not come forward about his suspected paternity.

### B.

Our primary task in this case, as noted earlier, is one of statutory interpretation. Because we are persuaded that the statutory purposes of the Parentage Act will not be effectuated by tolling the statute of repose, we reject the Appellate Division's approach in which a putative father would be required to attempt to establish paternity, even against a mother's wishes, or otherwise face an endless period of responsibility for child support. *See R.A.C., supra,* 380 *N.J.Super.* at 108–09, 880 *A.*2d 1179.

Had Patrick's conduct involved overt trickery or active deception to induce Roy into not bringing a child support action, the outcome might be different. *See Freeman, supra,* 347 *N.J.Super.* at 32, 788 *A.*2d 867 (finding "simply no factual allegation which bespeaks the kind of trickery or misconduct that would justify the application of equitable tolling"). That kind of wrongful conduct, which denies a putative plaintiff access to the courthouse, is different in kind from what we have here.[13] Against the backdrop

---

[13] In light of the muscular dystrophy gene that afflicted Patrick's family, we do not doubt that Darren's need to know his biological background for health and family planning purposes might have been an "extraordinary" circumstance warranting the tolling of the statute to allow for DNA testing to establish paternity. *See generally Fazilat, supra,* 180 *N.J.* at 88, 848 *A.*2d 761 (commenting that "confirmation of one's lineage may also provide 'medical benefits' by allowing the child to learn of the potential diseases and abnormalities he or she may inherit from parents and their forbears"). In this case, Darren was not a named plaintiff, and therefore this lawsuit is not about Darren's right to know his genetic make-up.

of the clearly worded repose statute, we cannot conclude that the Legislature intended the application of the doctrine of equitable tolling in the circumstances of this case.

## IV.

 Roy brought this child-support-reimbursement action under the Parentage Act almost eight years after the period of repose had expired. For the reasons expressed, we do not find the doctrine of equitable tolling applicable, and therefore the action is barred by *N.J.S.A.* 9:17–45b. Accordingly, we reverse and remand to the Appellate Division for consideration of any issue that may remain open as a result of our disposition of the Parentage Act claim.

*For reversal and remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.