# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3597-24

K.B.,[1]

    Plaintiff-Respondent,

v.

T.A.F.,

    Defendant-Appellant.

_____

Submitted May 19, 2026 – Decided June 2, 2026

Before Judges Susswein and Chase.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FD-15-0847-22.

Nicholas A. Moschella, Jr., LLC, attorney for appellant (Nicholas A. Moschella, Jr., on the brief).

Keith, Winters, Wenning & Harris, LLC, attorneys for respondent (Brian D. Winters, on the brief).

---

[1] Since this matter involves the paternity of minor children, initials and pseudonyms are being used to protect the confidentiality of the children. <u>See</u> <u>R.</u> 1:38-3(d)(14).

PER CURIAM

Defendant, T.A.F. appeals from the July 25, 2024 Family Part order entered after a plenary hearing requiring him to undergo paternity testing under the Parentage Act, N.J.S.A. 9:17-45(a). Because the trial court's findings are supported by substantial and credible evidence, we affirm.

I.

Plaintiff K.B. and defendant initially met in 2007, when plaintiff was an eighteen-year-old patron at defendant's tattoo shop. The parties remained in contact via social media and in or around 2014, had consensual sexual relations a couple of times. Plaintiff and defendant reconnected at a memorial event in February 2017. After drinking at the memorial service, the parties took a car share ride to defendant's home, where plaintiff alleges they had sex.

Plaintiff became pregnant and had twin girls, Molly and Mia, who were born in October 2017. Plaintiff testified that she initially believed the girls' father was a man she was in an "on again, off again" relationship with earlier that year. Following a court-ordered paternity test, it was confirmed the man was not the father. Plaintiff then reached out to another man she had a "one-night stand" with, and following a court ordered paternity test, learned that he too was not the father.

2

Plaintiff then purchased a DNA test kit for Molly and Mia, which indicated that there was a relation to a J.F. Plaintiff purchased a second DNA test kit, which she only used on Molly. The test resulted in a fifteen percent match on Molly's paternal side to a M.F. Besides having the same last name as defendant, plaintiff cannot confirm that J.F. or M.F. are related to defendant. Following the second DNA test kit results, plaintiff reached out to defendant who initially agreed to take an at-home paternity test. The parties planned to meet at defendant's tattoo shop in May 2022; however, when plaintiff arrived defendant refused to take the paternity test.

Plaintiff initiated her self-represented complaint for paternity in the Summer of 2022. Defendant retained counsel and moved to dismiss the complaint for paternity alleging the requisite facts to establish paternity were not met. Plaintiff retained counsel, filed and cross-moved to strike defendant's answer and compel defendant to submit to paternity testing. The trial court determined that a plenary hearing was needed to establish whether there was a reasonable probability of paternity.

A plenary hearing occurred over four dates between January and June 2024. Both plaintiff and defendant testified. Plaintiff testified that the parties had sexual relations but admitted during cross-examination that she had

previously messaged defendant stating that she did not recall their alleged sexual encounter. Defendant denied having sex with plaintiff in February 2017 following the memorial service.

Several exhibits were entered into evidence including a February 2023 Instagram message between plaintiff and defendant in which defendant told plaintiff that he had an "Aunt M.F. who lived in upstate New York, but she's gone." Plaintiff also presented Instagram messages from May 2023, in which the parties were planning for defendant to perform an at-home paternity test. Defendant's response to plaintiff stated, "Others are going to know. My family is going to know. Lots of people are going to know. We are about to let the genie out of the bottle. No use in hiding it now. You are 100 percent correct. It is scary." Over defense counsel's objection, screenshots of the results of the at-home DNA testing kits were also entered into evidence for the limited purpose of plaintiff's state of mind.

The trial court rendered an oral decision on July 25, 2024, ordering genetic testing and denying counsel fees. The written order was entered the following day. In its oral decision the trial court, relying on C.R. v. J.G., 306 N.J. Super. 214, 228 (Ch. Div. 1997), explained that the paternity test is not an automatic right and should only be ordered by a court after carefully balancing all the

A-3597-24

circumstances surrounding the alleged paternity. The trial court then analyzed the factors set forth by our Supreme Court in D.W. v. R.W., 212 N.J. 232, 257 (2012), that are necessary for determining whether good cause exists to order genetic testing.

After finding both parties credible, the trial court determined that plaintiff had ruled out other possible fathers, and by utilizing "a readily available commercial DNA testing company" came to her own reasonable conclusion that there was a possibility that defendant could be the father. The trial court noted that the timeline was plausible and that there was a reasonable possibility that sexual relations could have occurred. The trial court gave more weight to the overall testimony, including both parties admitting to spending the night in the same house and the use of alcohol, than to the plaintiff's denial, and concluded that there was sufficient good cause to order the paternity test, in line with legislative intent to establish parentage. The court also emphasized that considering the age of the children and the inability to locate the father, it was in the children's and the State's best interests to establish parentage and support—both financial and emotional.

The trial court granted defendant's motion to stay the imposition of the ordered paternity testing, pending his appeal.

A-3597-24

II.

An appellate court defers to a trial court's evidentiary ruling absent an abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021); State v. Jackson, 243 N.J. 52, 64 (2020); Rowe v. Bell & Gossett Co., 239 N.J. 531, 551 (2019); State v. Scott, 229 N.J. 469, 479 (2017); State v. Nantambu, 221 N.J. 390, 402 (2015); State v. Rochat, 470 N.J. Super. 392, 453 (App. Div. 2022). Appellate courts review the trial court's evidentiary ruling "'under the abuse of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). Under that deferential standard, appellate courts "review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

Likewise, appellate courts apply a deferential standard in reviewing factual findings by a judge. Balducci v. Cige, 240 N.J. 574, 595 (2020); State v. McNeil-Thomas, 238 N.J. 256, 271-72 (2019). In an appeal from a non-jury trial, appellate courts "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Griepenburg

6

v. Twp. of Ocean, 220 N.J. 239, 254 (2015). "A reviewing court should uphold the factual findings undergirding the trial court's decision if they are supported by 'adequate, substantial and credible evidence' on the record." New Jersey Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). "[A] trial court's factual findings 'should not be disturbed unless they are so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995). "To the extent that our review involves questions of statutory interpretation . . . our review is de novo." Brugaletta v. Garcia, 234 N.J. 225, 240-41 (2018) (citing Verry v. Franklin Fire Dist. No. 1, 230 N.J. 285, 294 (2017)).

Applying these standards, we first consider defendant's contention that the trial court abused its discretion in admitting into evidence exhibits relating to the at-home DNA testing utilized by plaintiff. Specifically, defendant argues that those exhibits constitute inadmissible hearsay that prejudiced him and could not be authenticated. Because the evidence was not offered for the truth of the matter asserted and instead, was admitted as either evidence of plaintiff's present sense impression or then-existing state of mind, the trial court did not abuse its discretion in admitting the evidence.

Defendant alleges three exhibits were improperly admitted into evidence. First, was a receipt for the at-home DNA test kit "23&me" containing defendant's name as a participant. Defendant objected to its admission. Following a colloquy between the trial court and plaintiff's counsel, the court explained that the evidence was being proffered to demonstrate plaintiff's understanding that she and defendant had come to an agreement that he would take the at-home DNA test. Defendant withdrew his objection, with the understanding that the evidence was not being offered to establish facts.

N.J.R.E. 801(c) defines "hearsay" as a statement that "the declarant does not make while testifying at the current trial or hearing; and a party offers in

evidence to prove the truth of the matter asserted in the statement." "'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." N.J.R.E. 801(a). A "writing" is broadly defined and includes photographs and electronic records. N.J.R.E. 801(e). Importantly, "if evidence is not offered for the truth of the matter asserted, the evidence is not hearsay and no exception to the hearsay rule is necessary to introduce that evidence at trial." State v. Long, 173 N.J. 138, 152 (2002) (citing State v. Chavies, 345 N.J. Super. 254, 274 (App. Div. 20001)). Because the receipt was not offered for the truth of the matter asserted it was properly admitted.

Second, the trial court admitted a screenshot taken by plaintiff showing certain results of DNA testing; specifically, that there was a fifteen percent shared DNA connection between plaintiff's daughter Molly and an individual named M.F. The evidence was admitted for the limited purpose of evincing plaintiff's state of mind—it formed a basis for plaintiff's presumption that defendant may be related to her daughters.

N.J.R.E 803(c)(1), present sense impression, is an exception to the hearsay rule not dependent on the declarant's availability. Present sense impression is defined as "[a] statement describing or explaining an event or condition, made

while or immediately after the declarant perceived it and without opportunity to deliberate or fabricate." N.J.R.E. 803(c)(1). In State ex rel. J.A., our Supreme Court considered the meaning of "immediately after" and made a distinction between delays measured in seconds versus delays measured in minutes. 195 N.J. 324, 339-40 (2008). The Court concluded that a witness statement taken ten minutes after a robbery was not "immediately after" and could not qualify as a present sense impression. Id. at 340.

Additionally, Rule 803(c)(3), then-existing mental, emotional, or physical condition, is a hearsay exception not dependent on the availability of the declarant. Then-existing mental, emotional, or physical condition is defined as:

> A statement made in good faith of the declarant's then-existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.
>
> [N.J.R.E. 803(c)(3).]

Whether a statement was made "in good faith" is a determination for the trial judge and will "depend on various factors inherent in the particular case." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1.2 on N.J.R.E. 803(c)(3) (2025).

A-3597-24

The trial court found that the evidence was supported by plaintiff's testimony, which the judge found credible, explaining:

> [T]he [c]ourt has taken the proffer and plaintiff's counsel has adopted the [c]ourt's indication that it — my words again —it's bolstering . . . what I refer to as state of mind evidence which, correctly articulated, has been testified to as well.  This bolsters that point.

Accordingly, this was properly admitted pursuant to N.J.R.E. 803(c)(3) as evidence of plaintiff's then-existing state of mind.

Last, defendant argues that pages printed out by plaintiff from her research on an ancestry website showing possible connections between plaintiff's daughter Molly and an individual named D.F. were improperly admitted.  The trial court admitted this evidence for a limited purpose explaining:

> If no one knows and there's no authentication about the science behind how [the website] develops the protocols to pop up this information, then I can admit it as to the limited purpose of the present sense impression because it's clear, based upon [plaintiff's] testimony, that the research she did developed the basis for her to develop the impression that she should ask the defendant for the test.  That's a [present] sense impression.

While the trial court used the language "present sense impression," it is clear from the record that he was referring to Rule 803(c)(3), plaintiff's then-existing mental condition.  As the trial court explained, the ancestry website printout

11

A-3597-24

demonstrated plaintiff's "intent, plan, motive, [and] design," that formed the basis for her to suspect defendant may be related to her daughters and was properly admitted for that limited purpose.

In sum, the above exhibits were properly admitted into evidence because they were either not offered for the truth of the matter asserted or fell within a recognized hearsay exception pursuant to N.J.R.E. 803(c)(3), then-existing mental state. The trial judge's evidential rulings do not demonstrate a clear error of judgment.

Defendant further asserts that admission of this evidence, without an opportunity to cross-examine the third parties who provided DNA to these respective testing services that resulted in matches to plaintiff's daughter, violated his Sixth Amendment right to confrontation pursuant to Crawford v. Washington, 541 U.S. 36 (2004). This argument is without merit because "[t]he Sixth Amendment right of confrontation is not applicable to civil proceedings." New Jersey Div. of Youth & Fam. Servs. v. V.K., 236 N.J. Super. 243, 253 (App. Div. 1989) (internal citation omitted). An action brought under the Parentage Act ("Act") is considered a civil proceeding governed by the rules of court. See N.J.S.A. 9:17-49(a) ("An action under this act is a civil action governed by the

Rules Governing the Courts of the State of New Jersey."). Accordingly, the confrontation clause is not applicable.

IV.

Defendant next argues that the trial court's order for paternity testing was against the weight and credibility of the evidence presented and as applied to the factors set forth in N.J.S.A. 9:17-43(E). We are not persuaded.

"Parents have a legal duty to support their children from birth until emancipation, 'which presumptively occurs when the child reaches the age of majority.'" D.W., 212 N.J. at 246 (quoting R.A.C. v. P.J.S., Jr., 192 N.J. 81, 94 (2007)). "One of the central purposes of the [Act], N.J.S.A. 9:17-38 to -59, is to ensure that children receive the financial support from their parents to which they are entitled." Ibid. (citing Wingate v. Estate of Ryan, 149 N.J. 227, 238 (1997)). "In enacting the [Act], the Legislature intended to 'make the identification of a child's father easier and thereby reduce[] the number of children requiring public assistance.'" Fazilat v. Feldstein, 180 N.J. 74, 87 (2004) (alteration in original) (quoting Assembly Judiciary, Law, Public Safety and Defense Committee, Statement to Senate Bill No. 888, at 2 (Oct. 7, 1982)).

To that end, the Act authorizes "any person with an interest recognized as justiciable," including a child's natural mother, to bring an action at any time to

determine the existence or nonexistence of a parent-child relationship. N.J.S.A. 9:17-45(a). If the parties cannot reach an agreement regarding parentage after an action is brought, "and blood tests or genetic tests have not been taken . . . the court shall order the child and the parties to submit to blood tests or genetic tests unless a party claims, and . . . the court finds, good cause for not ordering the tests." N.J.S.A. 9:17-48(d). The Act further provides, "[a] genetic test shall be ordered upon the request of either party, if the request is supported by a sworn statement by the requesting party which alleges paternity and sets forth the facts establishing a reasonable possibility of the requisite sexual contact between the parties." Ibid. "[O]nce the reasonable-possibility threshold of paternity or nonpaternity has been crossed, the default position is genetic testing. The burden is on the party-opponent to make a good-cause showing that genetic testing should not go forward." D.W., 212 N.J. at 249.

"Both the plain language and historical evolution of N.J.S.A. 9:17-48(d) strongly suggest that the Legislature did not intend to place overly restrictive conditions on the use of genetic testing when parentage is truly in dispute." Id. at 250. However, "[i]t is also clear that the Legislature did not open the door to genetic testing every time there is a reasonable possibility that paternity is in

dispute. The court may still deny a request for genetic testing for 'good cause' under N.J.S.A. 9:17-48(d)." Ibid.

In deciding whether "good cause" exists to deny genetic testing, "[t]he best interests of the child must be considered and given due weight, but the ultimate decision will depend on an appropriate weighing of all relevant factors." Id. at 257. Our Supreme Court enumerated those factors in D.W., explaining what must be considered in a court's good-cause determination whether to grant or deny genetic testing are:

> (1) the length of time between the proceeding to adjudicate parentage and the time that the presumed or acknowledged father was placed on notice that he might not be the genetic father;
>
> (2) the length of time during which the presumed or acknowledged father has assumed the role of father of the child;
>
> (3) the facts surrounding the presumed or acknowledged father's discovery of his possible nonpaternity;
>
> (4) the nature of the relationship between the child and the presumed or acknowledged father;
>
> (5) the nature of the relationship between the child and any alleged father;
>
> (6) the age of the child;

15

(7) the degree of physical, mental, and emotional harm that may result to the child if presumed or acknowledged paternity is successfully disproved;

(8) the extent to which the passage of time reduces the chances of establishing the paternity of another man and a child-support obligation in favor of the child;

(9) the extent, if any, to which uncertainty of parentage exists in the child's mind;

(10) the child's interest in knowing family and genetic background, including medical and emotional history; and

(11) other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the presumed or acknowledged father or the chance of other harm to the child.

[Id. at 257.]

"The weight to be given to any individual factor and its interplay with other factors will depend on the circumstances of each case." Id. at 257-58.

In considering the factors, the trial court appropriately analyzed each requisite factor and applied them to the evidence presented. Defendant agrees that this dispute centers on the court's finding the parties had sexual relations on the night in question and argues that many of the factors were not relevant.

Although defendant challenges the trial court's findings, the court considered the uncontroverted testimony that the parties attended the memorial

16

event, returned to defendant's home, and had consumed alcohol that evening. Moreover, the trial court made this finding after looking at the totally of the circumstances; including, plaintiff's prior written statement to defendant indicating she did not recall having sex with him on that night and listening to her testimony concerning both the letter and the night in question. Based on the evidence, the trial court ultimately determined there was a reasonable possibility that sexual relations occurred.

The trial court then turned to the best interests of the children, determining that it was in their best interest financially and emotionally to establish paternity. While not expressly addressing factor seven—"the degree of physical, mental, and emotional harm that may result to the child if presumed or acknowledged paternity is successfully disproved"—the court acknowledged the importance of "family identity and health history," "loving parents, plural," and a child's "ability to interact . . . with them." Thus, the court concluded that genetic testing was warranted and ordered that defendant, at the cost of plaintiff, make himself available for a paternity test.

The trial court sufficiently explained its reasonings, analyzing the appropriate factors and applying them to its factual findings. The trial court's findings were based on "adequate, substantial and credible evidence' in the

record[,]" <u>M.M.</u>, 189 N.J. at 279, and the trial court's legal conclusions are sound.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division